ROBERT COHEN *vs.* ATTORNEY GENERAL
(and a companion case [1]).

Suffolk.    February 4, 1970. — June 5, 1970.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, SPIEGEL,
REARDON, & QUIRICO, JJ.

*Constitutional Law*, Initiative, Constitutional convention.  *Words,* "Law."

Review of precepts on the construction of the Constitution of the Commonwealth.  [570–572]

Resumé of the Constitutional Convention of 1917–1918 with respect to the initiative provisions of the proposed art. 48 of the Amendments to the Constitution.  [572–577]

The provision in art. 48 of the Amendments to the Constitution for amending the Constitution by popular initiative is separate from and independent of the provision for enacting laws by popular initiative; the only part of art. 48 which gives any authority to initiate a procedure to amend the Constitution is the part which permits measures for specific amendments only; the part of art. 48 which provides for enacting laws by the popular initiative has nothing to do with amendments to the Constitution; the words "law" and "laws" as appearing in art. 48 do not include a measure which can result in the calling of a constitutional convention after being advanced in the manner provided for the popular initiative for enacting laws; and art. 48 did not introduce any method for the calling of a constitutional convention.  [578]

The General Court is the sole voice to ascertain the will of the people on the matter of calling a constitutional convention.  [578]

Article 48 of the Amendments to the Constitution does not authorize enactment by the initiative process of a measure requiring that there appear on the official ballot to be used at a State election a question whether a convention be called to amend the Constitution of the Commonwealth.  [566, 578] CUTTER, J., concurring in the result, with whom WILKINS, C.J., and SPALDING, J., joined.

---

[1] Robert Cohen *vs.* Secretary of the Commonwealth.

PETITION for a writ of certiorari and PETITION for a writ of mandamus filed in the Supreme Judicial Court for the county of Suffolk on September 16, 1968.

The cases were reserved and reported without decision by *Kirk, J.*

*Robert Cohen,* pro se *(Alexander J. Cella* with him).

*William E. Searson, III,* Assistant Attorney General, for the Attorney General & another.

*Morris M. Goldings (Richard B. Olson, Donald P. Quinn, Donald N. Sweeney & Donald F. Winter* with him) for John M. Quinlan & others, intervening respondents.

KIRK, J. The petitioner, a citizen and taxpayer of Massachusetts who is a registered voter of Newton, brings two petitions, one for a writ of certiorari against the Attorney General and one for a writ of mandamus against the Secretary of the Commonwealth. Both petitions challenge as unconstitutional an initiative petition brought pursuant to art. 48 of the Amendments to the Constitution of the Commonwealth, entitled, "An Act to ascertain and carry out the will of the people in 1970 relative to the calling and holding of a constitutional convention in 1971 to deal with subjects limited to the revision, alteration and amendment of the structure of government and to the rearrangement, simplification and methods of amending the constitution; and to provide for a preparatory commission therefor."

The petition for a writ of certiorari seeks to quash the Attorney General's certificate which accompanies the initiative petition. The petition for a writ of mandamus seeks to restrain the Secretary of the Commonwealth from placing the question set forth in the initiative petition on the ballot in the biennial State election in 1970.

The question reads: "Shall there be a convention to revise, alter or amend the constitution of the commonwealth in the year 1971; provided, that the convention shall be limited to considering and proposing revisions, alterations and amendments on . . . [certain specified] subjects . . . and on no others." The cases were each reserved and reported, without decision, by the single justice on the pe-

tition, the respondent's answer, the petition of the ten original signers to intervene as parties respondent, their answer as parties respondent, and a document with the caption, "Agreement as to all the Material Facts," self-described as a case stated.

1. The statement of agreed facts recites the several steps which thus far have been taken to advance the proposed measure as an initiative petition for a "law" under the provisions of art. 48 of the Amendments to the Constitution of the Commonwealth. The process of advancement of such a measure involves a series of justiciable questions "to be determined in the last analysis by the judicial department of the government whenever the question arises in a proper proceeding in court." *Sears* v. *Treasurer & Recr. Gen.* 327 Mass. 310, 320–323. In so far as the "Agreement as to all the Material Facts" would be at all pertinent to the issues before us, we regard it as a convenient calendar of events and actions relating to the proposal without attributing to those events and actions the legal significance which the agreement would seem to imply. We are bound only by "the Constitution of 1780 and its amendments . . . [which constitute] the fundamental law," the "great charter," "the final statement of the rights, privileges and obligations of the citizens and the ultimate grant of the powers and the conclusive definition of the limitations of the departments of State and of public officers." *Loring* v. *Young,* 239 Mass. 349, 376, 377 (August 8, 1921). *Opinion of the Justices,* 233 Mass. 603, 611 (January 20, 1920).

We deem it unnecessary and unwise, however, to discuss any issue save the one issue which looms large above all others. Its resolution will be decisive of both cases. In terms of the pending litigation the issue is: Does art. 48 of the Amendments to the Constitution authorize "ten qualified voters" to petition for the enactment of a law requiring that there appear on the official ballot to be used at the State election a question whether a convention be called to amend the Constitution of the Commonwealth?

2. In addressing the basic issue, we quote certain pro-

visions of art. 48 for convenient reference in the discussion which is to follow:

### I. *Definition.*

"[T]he popular initiative . . . is the power of a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection."

### THE INITIATIVE.

### II. *Initiative Petitions.*

§ 1. *Contents.* "An initiative petition shall set forth the full text of the constitutional amendment or law, hereinafter designated as the measure, which is proposed by the petition."

### IV. *Legislative Action on Proposed Constitutional Amendments.*

§ 1. *Definition.* "A proposal for amendment to the constitution introduced into the general court by initiative petition shall be designated an initiative amendment, and an amendment introduced by a member of either house shall be designated a legislative substitute or a legislative amendment."

§ 2. *Joint Session.* "If a proposal for a specific amendment of the constitution is introduced into the general court by initiative petition, . . . [it shall be considered in joint session]."

§ 4. *Legislative Action.* "[A]n initiative amendment receiving the affirmative votes of not less than one-fourth of all the members elected, shall be referred to the next general court."

§ 5. *Submission to the People.* "If in the next general court . . . an initiative amendment . . . shall again receive the affirmative votes of at least one-fourth of all the members elected . . . the secretary of the commonwealth . . . shall submit the amendment to the people at the next state election."

### V.  Legislative Action on Proposed Laws.

§ 1.  *Legislative Procedure.*  "If an initiative petition for a *law* is introduced into the general court, signed . . . [by a specified number of persons], [and if] the general court fails to enact such law before . . . [a specified date] and if such petition is completed by filing with the secretary of the commonwealth . . . [by a specified date a required number of additional signatures], then the secretary of the commonwealth shall submit such proposed *law* to the people at the next state election" (emphasis supplied).

### GENERAL PROVISIONS.

### V.  The Veto Power of the Governor.

"The veto power of the governor shall not extend to measures approved by the people."

### VI.  The General Court's Power of Repeal.

"Subject to the veto power of the governor and to the right of referendum by petition as herein provided, the general court may amend or repeal a *law* approved by the people" (emphasis supplied).

3. Some of the significant differences in the requirements of art. 48 for the adoption of constitutional amendments on the one hand, and for the enactment of laws on the other, when they originate by initiative, are:

(a) A constitutional amendment must be considered by the joint conventions of two different General Courts; whereas a *law* must be considered by a single General Court without joint convention.

(b) A constitutional amendment must receive "the affirmative votes of not less than one-fourth of all the members elected" at the joint conventions of two General Courts before it can go on the ballot; whereas a *law* is not required to receive any minimum number of affirmative votes in the General Court.  If the General Court fails to enact the proposed *law*, it automatically goes on the ballot at the next State election.

(c) A constitutional amendment approved by the voters is not subject to repeal by the General Court (other than by another amendment passed through the legislative process and approved by the voters); whereas a *law* proposed by initiative and approved by the voters may be repealed by the General Court, subject to the veto of the repealing act by the Governor.

4. The nature of the initiative petition before us must be understood. It does not set forth the text of any constitutional amendment. See The Initiative, II, § 1, *ante.* Rather it sets forth a measure which has as its ultimate goal the holding of a constitutional convention for limited purposes. Excluded from consideration by the prospective convention are such matters as the judiciary power, the Declaration of Rights, and excluded matters enumerated in § 2 of The Initiative, II, Initiative Petitions of art. 48. Included as subjects for consideration are matters relating to the Executive Branch, the General Court, the Executive Council, the government of municipalities and counties, and methods of amending the Constitution. Our consideration of the dominant issue is not affected by the purported restrictions on the agenda of the proposed convention.[2]

5. The intervening respondents (the ten persons who originally signed and initiated the measure for the convention) contend that the measure which they propose is a "law" within the meaning of that word as used in art. 48. The petitioner contends that it is not such a "law."

Our resolution of the basic issue requires that we decide whether the proposed measure falls within the meaning of the words "law" or "laws" as they are used in the initiative provisions of art. 48.[3] For this purpose we need not and we

---

[2] Our discussion and decision do not affect and are not affected by *Opinion of the Justices,* 6 Cush. 573.

[3] The instant cases present the problem for the first time for judicial decision. The problem, however, has been studied before. A similar initiative petition to compel the calling of a constitutional convention was circulated by a group of citizens in 1923. It failed to advance for want of the necessary number of signatures. The effort, however, resulted in a study of the problem which it would have presented, for example, to the Attorney General. The results of the study were set out in an article published in the July, 1924,

do not formulate or lay down a comprehensive definition of these words for all purposes. We should, and do, consider any judicial statements construing or defining the words. *Opinion of the Justices,* 262 Mass. 603, 604–605.[4] *Opinion of the Justices,* 66 N. H. 629, 632.[5] *American Banana Co.* v. *United Fruit Co.* 213 U. S. 347, 356.[6] Giving due consideration to all relevant judicial definitions, it yet remains for us to have due regard to the setting in which the words "law" and "laws" appear in art. 48, bearing always in mind that we are construing a constitution and not a statute. Nor do we lose sight of the fact that the Constitution to be construed is one which has a long and rich history.

6. This court has laid down precepts on the subject of construing our Constitution. In *Tax Commr.* v. *Putnam,* 227 Mass. 522, 523–524 (1917), the court said: "The Constitution of Massachusetts is a frame of government for a sovereign power. It was designed by its framers and accepted by the people as an enduring instrument, so comprehensive and general in its terms that a free, intelligent and moral body of citizens might govern themselves under its beneficent provisions through radical changes in social, economic and industrial conditions. It declares only funda-

---

edition of the Massachusetts Law Quarterly by Frank W. Grinnell, Esq. The article was reprinted in the July, 1960, edition of the Massachusetts Law Quarterly prefaced by a "warning letter" by Mr. Grinnell. As noted in 44 Mass. L. Q. (No. 4) 113, Mr. Grinnell "sat through the convention of 1917 . . . not as a delegate, but as an observer" and listened to the debates at almost every session.

Mr. Grinnell was a legal scholar, a student and writer of Massachusetts legislative history, and an authority on Massachusetts constitutional history. He was at one time Secretary of the Judicature Commission of the Commonwealth, secretary of its successor the Judicial Council when it was formed in 1925, Secretary of the Massachusetts Bar Association from 1915, and editor-in-chief of the Law Quarterly from 1915 to 1957. He was born in 1873 and died in 1964.

The petitioner quite candidly and justifiably places great reliance upon Mr. Grinnell's meticulous presentation and analysis of the issue.

[4] "The word 'law' imports a general rule of conduct with appropriate means for its enforcement declared by some authority possessing sovereign power over the subject . . . ."

[5] "Law 'is a rule: not a transient sudden order from a superior to or concerning a particular person; but something permanent, uniform, and universal.'"

[6] "Law is a statement of the circumstances in which the public force will be brought to bear upon men through the courts."

mental principles as to the form of government and the mode in which it shall be exercised. Certain great powers are conferred and some limitations as to their exercise are established. The original Constitution and all its Amendments together form one instrument. It is to be interpreted in the light of the conditions under which it and its several parts were framed, the ends which it was designed to accomplish, the benefits which it was expected to confer, and the evils which it was hoped to remedy. It is a grant from the sovereign people and not the exercise of a delegated power. It is a statement of general principles and not a specification of details. Amendments to such a charter of government ought to be construed in the same spirit and according to the same rules as the original. It is to be interpreted as the Constitution of a State and not as a statute or an ordinary piece of legislation. Its words must be given a construction adapted to carry into effect its purpose." Again, in *Attorney Gen.* v. *Methuen,* 236 Mass. 564, 573 (1921), the court said: "An amendment to the Constitution is one of the most solemn and important of instruments. It commonly is a brief and comprehensive statement of a general principle of government. It ordinarily is not long, complicated nor detailed and does not descend to the minute particulars appropriate to a statute. Its phrases are chosen to express generic ideas, and not nice shades of distinction. *Its words should be interpreted in 'a sense most obvious to the common understanding at the time of its adoption,' because it is proposed for public adoption and must be understood by all entitled to vote"* (emphasis supplied).

This court has spoken with greater specificity in reference to the Constitutional Convention of 1917–1918 from which art. 48 emerged. In *Loring* v. *Young,* 239 Mass. 349, 368, the court said: "These proceedings of the convention were public, they challenged the attention of a considerable portion of the people, and they were reported to a greater or less extent in the daily press. They constitute a part of the history of the convention and the circumstances under which the Rearrangement of the Constitution was submitted to

popular vote. They may be examined, not for the purpose of controlling the plain meaning of words written into the Rearrangement of the Constitution but of understanding the conditions under which it came into existence and how it appears then to have been received and understood by the convention." See *Opinion of the Justices,* 233 Mass. 603, 604–605.

7. It is altogether proper therefore that we give a resumé of the convention in so far as it would throw light on the issue before us and more particularly that we examine the records of the debates and proceedings of the convention, all for the purpose of understanding the conditions under which art. 48 came into existence, and how it appears then to have been received and understood by the convention. Thus we shall be enabled to interpret the words "law" or "laws" in art. 48 in "a sense most obvious to the common understanding at the time of its adoption."

We note that one of the main issues in the campaign for the election of delegates to the Constitutional Convention of 1917–1918 was whether the Constitution should be amended by adding provisions for the Initiative and Referendum. The issue received considerable newspaper coverage before as well as during the convention. Groups and committees on both sides of the issue sought commitments from candidates during the campaign. Questions were raised during the debates whether delegates had committed themselves to support or to oppose the Initiative and Referendum, or whether they had changed their positions on the issue. The Constitutional Convention voted on November 28, 1917, by a vote of 163 to 125, to submit what is now art. 48 to the people in the next State election. The people ratified and adopted it at the election held on November 5, 1918. The debate and proceedings on the Initiative and Referendum provisions which we now find in art. 48 took more time of the convention than any other subject or proposal before it. The debates on the proposal, and on suggested amendments thereto, consumed most of the time of the convention from August 7, 1917, to November 28, 1917. It took the entire

1,086 pages of Volume 2 Debates in the Massachusetts Constitutional Convention of 1917–1918 to record the debates and proceedings on the Initiative and Referendum amendment.

The record indicates clearly what the delegates to the convention meant and intended to accomplish by the amendment which they submitted to the people for ratification and adoption. Many speakers referred to the two then existing and available methods of amending the Constitution, viz. (a) the method of calling a Constitutional Convention by action originating with the General Court and which had resulted in the conventions of 1820, 1853 and of 1917–1918 then in progress; and (b) the method provided by art. 9 of the Amendments (between 1821 and 1918) by action also originating in the General Court. The speakers who referred to the change which would result from the adoption of the Initiative and Referendum amendment referred to it as a "third" method applicable to a "specific" or "particular" or "specific and particular" amendment to the Constitution. This "third" method involved the securing of signatures, consideration by joint conventions of two different General Courts, and a favorable vote by the people before an amendment could be adopted.

An examination of the entire record of the debates and proceedings of the Constitutional Convention relating to the proposed Initiative and Referendum amendment discloses no expression of any thought, suggestion, belief, claim or fear on the part of either proponents or opponents that the amendment, if adopted, would permit the use of the popular initiative procedure to call a constitutional convention. The record demonstrates that the proponents argued that the people would be given a method of adopting "specific" or "particular" amendments to the Constitution by means of a popular initiative procedure; and that the opponents argued that the two methods then existing for amending the Constitution were adequate. Many compromises were suggested during the course of the debates, and some were reached. An important compromise (the Loring amendment,

so called) resulted in the requirement that a constitutional amendment proposed by the popular initiative must receive the vote of one fourth of all the members elected in joint convention of two different General Courts before it could be placed on the ballot at a State election. No requirement of that sort was inserted as to a measure proposing the adoption of a law by the popular initiative. Other important compromises resulted in the exclusion of certain constitutional subjects or matters from the scope or reach of amendment by the popular initiative. No one suggested a compromise or made any motion to amend the majority report of the Committee on Initiative and Referendum so that it would permit the holding of a constitutional convention called as the result of the popular initiative.

It is clear from a reading of the debates of the delegates to the convention that the delegates thought and intended that the only part of the Initiative and Referendum proposal which could result in the amending of the Constitution was the part which referred to proposals for the specific amendments to the Constitution and that they never thought or intended that the part relating to an initiative petition for a law could ever and would ever be used for or result in constitutional amendments.[7] It seems clear from the language

---

[7] On September 6, 1917, delegate Albert Bushnell Hart addressed the convention sitting as the Committee of the Whole in part as follows: (Vol. 2, 440) "The debate this morning has brought out another fact of major interest, — that the legislative initiative [i.e. for a law] is not at all the question that disturbs and distresses the members of this Convention; they are agitated solely over the constitutional initiative. I should not like to make the offer, that if the friends of the initiative and referendum would accept the amendment of the gentlemen from Lynn (Mr. Lummus) now pending, by which constitutional amendments should be withdrawn from the Walker measure [the majority report], the remaining part of the proposition would pass this Convention without difficulty; many of the members would feel enormously relieved if they could go to their constituents and say: 'Here, here is the initiative and referendum which you desire and which we promised to give you, — the friends of the I. and R. have abandoned the constitutional provision.'" There were several motions presented to the convention to remove constitutional amendments from the scope of the initiative procedures. One of these was filed by Honorable Henry T. Lummus, later an Associate Justice of this court. The first such motion debated was one filed by another delegate. Several short excerpts from that debate on September 12, 1917, will serve to emphasize that the convention believed that the elimination of the provision for constitutional amendment by initiative would totally eliminate the Constitution from the reach of an initiative petition. The principal spokesman for the majority report, Mr. Joseph Walker, former

of the delegates quoted in the footnote that they felt that if the express provision for amendment of the Constitution by popular initiative were eliminated, leaving only a popular initiative for legislation, no change in the then existing methods of amending the Constitution would result. It logically follows that if the provision for a popular initiative for legislation standing alone would have made no change in the methods of amending the Constitution, it could acquire no greater meaning by the addition of a provision expressly authorizing specific amendments of the Constitution by popular initiative.

8. In further pursuit of our inquiry we trace the proceedings of the convention back to the proceedings in the committee of fifteen appointed to The Committee on Initiative and Referendum (Committee). Most of the Committee members appear to have been active and prominent in public affairs at that time. On July 23, 1917, a majority of eight members of the Committee filed a report recommending that the convention adopt a resolution favoring the amendment of the Constitution to provide substantially what is now contained in art. 48. The minority of seven members of the Committee filed a separate report. (For

speaker of the House of Representatives, said (Vol. 2, 626): "I believe that this Convention will take an absolutely untenable position if they permit the people to pass laws and deny them the right to amend their Constitution." In reply to that and other statements by Mr. Walker the delegate who followed, Mr. John F. Cusick, said (Vol. 2, 627): "I believe that a number of the delegates of this Convention are able to distinguish between statute law and the fundamental law of this Commonwealth. I am ready to try the initiative and referendum as applied to statute law. I refuse to consent to the application of the initiative and referendum as applied to the Constitution of this Commonwealth. . . . I would not object to voting for a legislative initiative and referendum, but I shall not vote to adopt that policy for the fundamental law of this Commonwealth." That particular motion to eliminate constitutional amendments from the scope of initiative procedures was defeated. Similar motions were again made before the full convention and were again defeated. In speaking on them on November 9, 1917, Justice Lummus said (Vol. 2, 941–942): "Now, taking these amendments one by one, the first two are the amendments to take out of the initiative measure the Constitution. . . . We shall have a relaxed form of legislative amendment even if the initiative is not applied to the Constitution, and I submit that that relaxed form of legislative amendment will smooth the way for everything that the people want and need. In the early stages of this debate we never heard a word about the absolute necessity of the constitutional initiative. . . . It was not until it became apparent that there was doubt of the passage of the constitutional initiative that this propaganda was started about the absolutely essential character of the constitutional initiative."

both reports, see 2 Debates in the Massachusetts Constitutional Convention of 1917–1918, 3–15.) The signers of the minority report included a number of experienced lawyers of great prominence in their profession. The minority report states many grounds of objection to permitting the proposed popular initiative procedures for constitutional amendments as well as for "ordinary laws." It says that the opposition to constitutional amendments "is a question of principle, of duty," and that as to the "enactment of ordinary laws . . . if there be no amendment of the Constitution by the initiative, it is a question rather of wisdom and expediency." The minority report of objections to the application of Initiative and Referendum procedures to the "enactment of ordinary laws" covers nine printed pages giving many detailed reasons for the objections. It is of great significance that among the many objections to the "enactment of ordinary laws" by initiative procedures there was no suggestion or objection that such procedures would open a new way to call a constitutional convention. If the minority members of the Committee thought for a moment that the adoption of laws by popular initiative would relax or change the then existing methods of amending the Constitution, we can expect that they would have included that point as another ground of objection thereto, since they were even more concerned about the application of the initiative procedures to changes in the Constitution than to the enactment of laws.

9. We think it is fair to conclude from a study of the records and proceedings of the convention of 1917–1918 that to the delegates to that convention the use of the initiative petition as a device to call a constitutional convention was unthinkable.

10. Our conclusion is supported by the record of subsequent deliberations at the convention. As we have earlier noted in this opinion, on November 28, 1917, the Constitutional Convention voted to submit the Initiative and Referendum amendment, now art. 48, to the people for ratification and adoption at the State election to be held on Novem-

ber 5, 1918. On July 24, 1918, the convention was still in session. On that date, eight months after the convention had voted on the Initiative and Referendum, a debate was held on a proposal to amend the Constitution by adding a provision for future constitutional conventions to be called at specified intervals by the General Court. The very fact of the proposal tends to show that the delegates thought that they had not theretofore in any way dealt with the subject of future constitutional conventions. In particular the remarks of the delegates who had been active in the Initiative and Referendum Debates, and who likewise participated in the debates on the proposal for periodic conventions in the future, clearly point to the conclusion that anything they had earlier recommended was in no way related to the calling of a constitutional convention. In the footnote are excerpts from the debate of July 24–25, 1918, in 3 Debates in the Massachusetts Constitutional Convention of 1917–1918.[8]

---

[8] *Page 1289:* MR. WASHBURN: "The initiative and referendum amendment which this Convention has adopted for submission provides a comparatively easy way under which the people may amend their organic law. In view of that fact, I for one am quite content to leave the matter of submitting the question of calling a Convention to the discretion of the Legislature." MR. HORGAN: "If that is so, I desire to ask the gentleman from Middleborough (Mr. Washburn) if that power, provided the people adopt it, is not sufficient protection, without the special provisions which he now is requesting this Convention to adopt in relation to future Conventions." MR. WASHBURN: "I apprehend that the initiative and referendum, if it ever becomes a part of the organic law of this Commonwealth, will be invoked from time to time for the purpose of proposing *specific and particular* amendments to the Constitution, and such amendments only; but the time may come, as it came last year, and as happened in 1853 and as happened also in 1820, when there will be real need for a Convention to revise the organic law as a whole, and if that time does come again I think the fact will be manifested through the Legislature and the people will indicate their will and pleasure in that way."

*Page 1299:* MR. CREED: "The fact is that there is no need of this resolution. We have several methods of amending our Constitution: the one, under the legislative amendments, under the ninth article, which came out of the Convention of 1820; the other, — and I assume that the gentleman from Middleborough [Mr. Washburn] thinks that the initiative and referendum will be adopted by the citizenry at the next election, — the so-called Loring amendment contained in that amendment which is going on the ballot at the next election. And we also have the fact that if a situation arose in the Commonwealth, as it did in 1916, whereby the people, — the voters, — believed that there was a necessity for a Convention so that they could take up the whole question of the Constitution, which of course is not provided in the other two methods to which I have referred, the pressure of public opinion would force the Legislature to call a Constitutional Convention."

Upon a full consideration of the language of art. 48 as illuminated by the records of the proceedings of the Constitutional Convention of 1917–1918 we conclude that

(a) The provision in art. 48 for amending the Constitution by popular initiative is separate from and independent of the provision for enacting laws by the popular initiative.

(b) The only part of art. 48 which gives any authority to initiate a procedure to amend the Constitution is the part which permits measures for specific amendments only.

(c) The part of art. 48 which provides for enacting *laws* by the popular initiative has nothing to do with amendments to the Constitution.

(d) The words "law" and "laws" as appearing in art. 48 do not include a measure which can result in the calling of a constitutional convention after being advanced in the manner provided for the popular initiative for enacting laws.

(e) Article 48 did not introduce any method for the calling of a constitutional convention.

The holding of a constitutional convention is an act of the highest order in the body politic. By definition it may be held only with the consent of the people. Our Constitution, from the time it was adopted to this date, despite amendments in convention or otherwise, has contained no express provision for the ascertainment of the people's will on the subject. But time, tradition, experience and the common consent of the people have ordained that the sole authentic voice to make inquiry of the people's wish on the matter is the constitutionally representative body of the whole people, the General Court.

If the course of time and events should move the General Court to pose the inquiry to the people, and the answer is in the affirmative as it was in 1820, 1852, and 1916, then the solemn compact "by which the whole people covenants with each citizen, and each citizen with the whole people," will be placed before their delegates in convention assembled to consider and make recommendations to the people for its modification, alteration and amendment.

In case No. 14,403 the certificate issued by the Attorney General on September 6, 1967, with reference to the initiative petition is to be quashed.

In case No. 14,404 a writ of mandamus is to issue enjoining the Secretary of the Commonwealth from placing on the ballot for the 1970 State election the question whether a constitutional convention be held in 1971.

*So ordered.*

CUTTER, J. (concurring). I concur in the result on the limited ground stated below. Certain 1918 debates (3 Debates, 1281–1301) in the 1917–1918 Constitutional Convention are mentioned in part 10 of the opinion. These 1918 debates convince me that the participants thought that any constitutional convention, occurring after the adoption of art. 48, would be initiated by action of the Legislature seeking a vote of the people consenting to such a convention. The 1918 debate related to a proposal (in fact rejected by the 1917–1918 convention, see 3 Debates, 1298, 1301) for an amendment providing for the calling of future conventions. It raised for discussion the methods of calling a convention which already existed, and those which would exist after the then expected adoption by the people of what is now art. 48. That proposed amendment had already been approved in 1917 (see 2 Debates, 1054, 1062) for submission to the people. The 1917 debates, however, had not been addressed primarily to the problem of amendments of the Constitution by convention.

The proposal now before us seems to me to be of a type, which, if adopted by the Legislature and approved by the Governor, would be in the same category as St. 1820, c. 15; St. 1852, c. 188; and St. 1916, c. 98, each calling an earlier convention. It would be a statute and thus a "law" according to the ordinary usage of those words. The general language of art. 48 concerning the Initiative, standing by itself, seems to me broad enough to permit adoption of such a "law" by use of the Initiative. Such a view seems to me consistent with our authorities. See *Opinion of the Justices,*

226 Mass. 607, 610; *Loring* v. *Young,* 239 Mass. 349, 358. See also *Opinion of the Justices,* 233 Mass. 603, 605. Cf. *Opinion of the Justices,* 262 Mass. 603, 604–605 (dealing with a proposed public opinion referendum on the repeal of the prohibition amendment). Apart from the 1918 debates, I would think that the language of art. 48 should be so interpreted. See Goldings, The Use of the Popular Initiative Petition for a Constitutional Convention Act, 47 Mass. L. Q. 367.

The 1918 debates mentioned above, however, reveal the contemporaneous understanding of some of the most active participants in framing art. 48. I am persuaded by these 1918 debates that the general language of art. 48 should be construed as not including the somewhat special type of "law" or statute (not expressly described or authorized in the Constitution; see 3 Debates, *supra,* 1283–1285, 1287–1288, 1295–1296, 1299–1301) designed to bring about a vote of the people to hold a constitutional convention.

The Chief Justice and Mr. Justice Spalding authorize me to state that they concur in this separate opinion.